J-S01017-26
J-S01018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1228 WDA 2025 |

Appeal from the Order Entered September 3, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000040-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1229 WDA 2025 |

Appeal from the Order Entered September 2, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000041-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.P.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1305 WDA 2025 |

Appeal from the Order Entered September 3, 2025

J-S01017-26
J-S01018-26

In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000040-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D.M., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.P.M., FATHER | : : : : : : | |
| | : | No. 1306 WDA 2025 |

Appeal from the Order Entered September 2, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000041-2025

BEFORE:   BOWES, J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.:            **FILED: March 17, 2026**

A.A. ("Mother") and C.P.M. ("Father") (collectively, "Parents") appeal[1]

from the September 2, 2025, and September 3, 2025, orders involuntarily

terminating their parental rights to their minor children, K.M. (d.o.b. June

_____

[*] Former Justice specially assigned to the Superior Court.

[1] This Court consolidated each of Mother's and Father's appeals *sua sponte* on October 24, 2025. We address the appeals of Mother and Father in this consolidated Memorandum.

- 2 -

2021) and K.D.M. (d.o.b. August 2022) (collectively, "Children").[2]   A brief

factual and procedural history was addressed in the Orphans' Court Opinion:

> It appears that Mother and Father were an intact family until sometime in 2023. On October 6th, 2023[,] police were called to Mother's home after the children were found wandering alone in the street. When police arrived, they found the home in deplorable condition and believed Mother to be suffering from a mental health episode. She was involuntarily committed to Western Psychiatric Institute and Clinic [("WPIC")] that night and the children were placed in protective custody. [Allegheny Office of Children Youth and Families ("OCYF")]) sought and was granted an Emergency Custody Order for the children[ who] were formally removed from Mother's care on October 7th, 2023. Mother was hospitalized until October 30th, 2023. OCYF attempted to locate Father but was unsuccessful and the children were placed in foster care. Several weeks later, Father was located but reported that he could not take custody of the children because he was homeless at that time. When the OCYF caseworkers were finally able to interview the parents, they both reported a history of intimate partner violence (hereinafter "IPV"). Father reported that he had separated from Mother and had sporadic contact with the children.
>
> The parties appeared for an Adjudicatory Hearing on November 30th , 2023 where both children were adjudicated dependent. The court ordered the children to remain in their respective foster care placements[, where they still remained 22 months' later at the time of the termination of parental rights ("TPR") hearing]. Mother was court ordered to participate in mental health treatment and medication management, to work with coached parenting, and to

---

[2] On May 7, 2025, the court appointed KidsVoice as legal counsel for Children, making a finding that there was no conflict between Children's legal and best interests. *See* N.T. TPR Hearing, 8/8/25, at 5. At the August 8, 2025, termination of parental rights ("TPR") hearing, Attorney Jennifer McGarrity of KidsVoice represented that, since the May 2025 appointment, she had met with Children, then four and two years' old, and that, based on their ages and development, there continued to be no conflict because Children were unable to understand the proceedings or express a preferred outcome. *See id.* Based on this representation, the court expressly found that there was no conflict in Attorney McGarrity representing both Children's legal and best interests. *See id.* at 6.

clean her home. Father was ordered to complete a POWER and mental health evaluations and follow all recommendations. He was also referred to coached parenting. Both parents were ordered to work with in-home services to coordinate services.

Orphans' Court Opinion, 10/24/25, at 1-2 (unnecessary capitalization omitted; pagination provided).[3]

Between the adjudicatory hearing and the April 10, 2025 filing of the termination of parental rights ("TPR") petition, Parents appeared for permanency review hearings on March 14, 2024, June 20, 2024, September 19, 2024, and December 12, 2024. They appeared for two more hearings, on April 10, 2025 and July 16, 2025, after the petition had been filed.

At five of the six permanency review hearings, Father was found to be minimally compliant with his reunification goals and to have made minimal progress toward alleviating the circumstances that necessitated placement of Children. His contact with OCYF was sporadic, he did not engage in drug and alcohol treatment, and had been discharged from POWER and the coached parenting program for lack of contact. He did not consistently attend random drug screens, and was not actively participating in drug and alcohol, mental health, or IPV treatment. Although the court found him moderately compliant and that he had made moderate progress at the December 12, 2024 hearing, Father remained homeless and had not been attending drug screens or IPV

_____

[3] The Orphans' Court authored one thorough opinion explaining its termination decision as to both Parents. It is filed it at each of their docket numbers.

- 4 -

counseling consistently. At the April 10, 2025 hearing, held after the TPR petition had been filed, the court also found Father was not consistently attending visits with Children.

Mother's minimal and moderate compliance and progress was about 50/50. Specifically, at the March 14, 2024, June 20, 2024, and April 10, 2025 hearings, Mother was found to be minimally compliant with her reunification goals and progress in alleviating the circumstances necessitating Children's removal and placement. On September 19, 2024, December 12, 2024, and July 16, 2025, the court found Mother moderately compliant and that she had made moderate progress. Earlier in the case, Mother failed to maintain contact with OCYF, had not engaged in drug and alcohol treatment and was discharged from POWER and coached parenting for lack of contact. Mother started visiting Children and engaged with the coach parenting program. She was engaged in mental health treatment, but was not consistently attending drug screens. Mother's compliance improved to moderate in the fall and early winter of 2024, engaging in mental health treatment, completing a round of IPV treatment, and consistently visiting Children. However, Mother was still not compliant with random drug screens and had missed some visits with Children. At the permanency review hearings held immediately after the TPR petition was filed, the court found Mother in minimal compliance with minimal progress again. Mother would not sign releases for OCYF to obtain information about her mental health treatment and she continued to have problems with service

providers, a consistent issue since the Adjudicatory Hearing. On the positive side, the court rated Mother as moderately compliant with moderate progress in July 2025, a few weeks before the TPR hearing.

Most concerningly, a recurrent theme was the IPV between the parties. Mother was arrested and charged with domestic violence during the June 10, 2024 reporting period. Despite Mother completing a round of IPV treatment as of the September 19, 2024 permanency review hearing, the orphans' court explained that:

> [Approximately six months' later, on] March 31st , 2025, police were dispatched to UPMC McKeesport for a possible assault. When officers arrived at the scene, Father reported that Mother had physically attacked him prior to coming to the hospital. The police noted that Father had visible injuries to his face and neck. While the officers were attempting to retrieve Father's phone from Mother, she became combative. The officers had to forcibly take Mother into custody. [Mother was criminally charged and a no-contact order was entered precluding contact between Mother and Father.]
>
> On May 26th , 2025, [more than six weeks after OCYF filed the TPR petition,] McKeesport Police officer Anthony LeDonne responded to a call at Mother's home. When he arrived on the scene, Officer LeDonne observed Father to be covered in blood[, despite the existing no-contact order between the parties. ***See*** N.T. TPR Hearing, 8/8/25, at 7.] Father reported to the officer that Mother cut him with a knife. [***See id.*** at 9, 15.] When Officer LeDonne entered the home, he reported that it was in disarray and that there was broken glass throughout the apartment. Officer LeDonne observed Mother to have fresh cuts on her face and testified that Mother reported that Father had caused those injuries. Based on his training and experience, Officer LeDonne believed that the injuries he observed on Mother were self-inflicted and that she had been the aggressor. He further reported that Mother was in a "manic state". [***Id.***] at 14. She was criminally charged as a result of this incident[, although the charges were

later dropped for Father's refusal to cooperate]. Mother was also involuntarily committed and placed on a psychiatric hold.

Orphans' Court Opinion, 10/24/25, at 4-5 (pagination provided; unnecessary capitalization omitted).

The court held a contested TPR hearing on August 8, 2025. At the hearing, OCYF caseworker Rhianna Diana testified that OCYF got involved with the family in October 2023 after the incident in which police had responded to the family's home, observed K.D. wandering alone naked, assumed protective custody of Children, and taken Mother to WPIC. **See** N.T. TPR Hearing, 8/8/25, at 128-29, 200. Mother told OCYF that she let Children, then aged one and two, go out at night because she heard a voice telling her that Children would be better off. **See id.** at 132. At the home, Children were sleeping in rooms that had feces smeared on the walls, and Mother admitted she could not care for them due to her mental health. **See id.** at 129, 132-33, 201.

OCYF could not immediately locate Father, who was homeless. **See id.** at 129. When he was located, Father said he had inconsistent contact with Mother and Children because he had been kicked out of the home. He admitted he was on probation and had a lengthy criminal history. **See id.** at 130. Between Children's removal and the Dependency Adjudication, CYF offered Father services. Father was offered a Father Engagement Specialist ("FES"), referred for IPV treatment, and offered a POWER (drug and alcohol) referral. **See id.** at 136.

Diana testified Parents' court-ordered and Family Plan goals included addressing sobriety, mental health, IPV and housing[4]; and attending supervised visits with Children. *See id.* at 140, 157. Although drug concerns were not the primary reason OCYF was involved with the family and Mother was only referred for one POWER assessment, OCYF was concerned about Mother's sobriety and her ability to keep Children safe because, even though she eventually obtained a medical marijuana card, Mother admitted she becomes paranoid when using the drug. *See id.* at 141-42, 212. Despite Father's corroboration with Mother's claim that she completed the POWER assessment and was told she did not have substance abuse concerns, she did not provide Diana with any proof that it occurred. *See id.* at 141, 360-61. Mother failed to attend all required drug screens. Diana testified that Mother admitted at the April permanency review hearing that someone gave her cocaine at a party, and that Mother said she was "able to dabble because she's still young and likes to party." *Id.* at 143; *see id.* at 142, 333.

Father's sobriety goal was created to evaluate if he needed treatment other than, or in addition to, medical marijuana. *See id.* at 157. Diana and OCYF case aides smelled marijuana on Father several times, although this was not appropriate at visits. *See id.* at 158-59. POWER evaluations were made

---

[4] Diana testified that CYF considered Mother's housing goal met since she addressed the cleanliness issue and maintained appropriate housing throughout the case after Children's removal. *See* N.T. TPR Hearing, 8/8/25, at 153-54, 214.

for Father, which he never attended despite in-home services and the FES, which could have assisted him with attending his evaluations or other substance abuse treatment. *See id.* at 160, 215.

Tarraca Jackson from the Allegheny County Health Department testified that Mother only attended ten of thirty-four screens, with nine positive for marijuana and one positive for cocaine. *See id.* at 23. Father was called in for thirty urine screens and had twenty-nine no-shows. The five urine samples they did get all tested positive for marijuana. *See id.* at 24-25.

One of OCYF's main concerns was Mother's mental health because it interfered with her ability to keep Children safe and, although Mother reported being in treatment at WPIC, she refused to sign releases, so OCYF was unable to confirm her participation. *See id.* at 134, 143-44. Mother started attending weekly therapy sessions on April 3, 2025 through July 10, 2025, in part because of her involuntary commitment at Clarion Psychiatric, but OCYF still did not receive supporting documentation. *See id.* at 213. According to OCYF supervisor Anthony Pedecino, Mother made some progress after she began mental health treatment and medication, with her appearing agreeable, easy to talk to, and not argumentative. *See id.* at 214. However, when Mother did not like what was said to her, she turned belligerent and verbally aggressive, calling Diana names, with the latest incident occurring just four months before the TPR hearing. *See id.* at 145-46.

The court and OCYF also wanted Father to connect with mental health treatment. Although the FES and in-home services provided by OCYS could have helped Father to meet that goal, he never documented any mental health treatment. *See id.* at 161. Father was shot in the leg in 2024, after which he was afraid to leave his home. Caseworker Diana testified that following that incident she had numerous conversations with Father about engaging in mental health treatment, and he finally reported being engaged with Auberle, for which he signed a release. *See id.* at 162 63. Records indicated that he did a mental health intake on April 30, 2025. *See id.* at 215, 227-28. Father testified he started therapy at Auberle after that to address mental health issues including PTSD and IPV, but had not seen his therapist for two months as of the TPR hearing. *See id.* at 358-59.

In-home and FES services also were offered to assist Father with obtaining appropriate housing, since he was homeless when OCYF opened the case, staying on and off with Mother, friends, and his Mother. *See id.* at 165, 167. Auberle started working with him on his housing goal on September 27, 2024. Although Father obtained housing in February of 2025, he was evicted after the May 26, 2025 IPV incident, since Mother broke windows and destroyed the home's interior. *See id.* at 167, 217).

Relatedly, OCYF's major concern was the level of IPV in the home. Mother completed one round of 8-10 classes of IPV treatment by September of 2024. *See id.* at 154-55, 156, 201. She then sporadically attended further

IPV treatment. But, despite this, there were two recent incidents of IPV between Mother and Father in March and May of 2025, only a few months before the TPR hearing. *See id.* at 155. Since the May incident, Mother was referred to the Batterer's Intervention Program, but as of the TPR hearing, she still was on the waiting list. *See id.* at 214-15. Mother admitted there had been IPV incidents between Father and her prior to the removal of the Children and that they do not have a healthy relationship. *See id.* at 360. Mother claimed to be "a hundred percent aware of" the impact of violence on Children. *Id.* at 328. Despite there being an IPV incident in which she was the aggressor only three months before, she stated she did everything she could to protect Children. *See id.* at 328-29. Diana testified that Mother had made some progress within the last month or month and a half before the TPR hearing, but did not believe she had made sufficient progress in addressing the IPV concerns. *See id.* at 196.

Caseworker Diana further testified that Father participated in two sessions of IPV treatment through the Women's Center and Shelter. *See id.* at 163, 205. Supervisor Pedicino testified Father attended one session of IPV treatment in April of 2025, and that when he saw Father after the March 31st IPV incident, Father had a black eye along with scratches and welts down his neck. *See id.* at 216. At that time, Father told Caseworker Diana that he was scared and worried he could not keep himself or his children safe. Although he told her he was ready to engage in IPV treatment because he felt he needed

it, Caseworker James testified Father had not yet engaged in treatment for IPV as of July 3, 2025. ***See id.*** at 164-65, 233.

Mother's UPMC therapist, Kate Thurston-Griswold, testified she began working with Mother in August 2024, but Mother's attendance had been sporadic, with her cancelling and failing to attend more recently due to incarceration and hospitalization ***See id.*** at 294, 298, 310. Mother's therapy goals included addressing her trauma history and changing patterns in how she coped with change and conflict. ***See id.*** at 296. Thurston-Griswold has observed progress in Mother's insight into how trauma has shaped her and her patterns of behavior. ***See id.*** at 301. However, Thurston-Griswold was not fully aware of Mother's IPV history. ***See id.*** at 305-07. Although Mother testified she was addressing her IPV issues with Thurston-Griswold, the therapist acknowledged she is not a domestic violence therapist. ***See id.*** at 306. In fact, she was unaware that the responding police officer believed Mother's wounds at the latest IPV incident were self-inflicted and conceded that for Mother to have been involuntarily committed there had to have been a determination that she was considered a danger to herself or others. ***See id.*** at 302, 305, 307-08. Mother also started seeing a psychiatrist a few months prior to the hearing. ***See id.*** at 311.

OCYS offered Father coached visitation through the Children's Institute, but he did not engage in the services, although he and Mother did complete coached parenting through Justice Works. ***See id.*** at 138, 275-76. Parents'

visitation with the Children remained supervised throughout the life of the case due to concerns about their ability to meet Children's needs, and how Parents' mental health and IPV affected their parenting abilities. *See id.* at 148-51, 165, 217.

Despite both Children having special needs, Mother's attendance at their medical and therapeutic appointments had been sporadic, and OCYF was not aware of Father ever attending. *See id.* at 218, 236-37. Children's Foster Parents had to be appointed as secondary educational and medical decision-makers because Mother and Father did not sign consent forms, resulting in service delays. *See id.* at 137, 153, 245, 264-65. K.M. receives speech and physical therapies, wears orthotics to strengthen and straighten his legs, and is on a waitlist for outpatient behavioral therapy. *See id.* at 237. K.D.M. was diagnosed with attachment disorder, is on a waitlist for trauma therapy, and is receiving behavioral health services, occupational therapy, and developmental specialist interventions. *See id.* at 238-39. Both sets of Foster Parents ensure K.M. and K.D.M. receive all necessary medical and therapeutic care. *See id.* at 237-39.

Pressley Ridge Treatment Coordinator Thomas Lee testified Mother did not visit K.M. regularly although Father did, one time dropping off Christmas gifts for him. *See id.* at 244, 255. Although Mother occasionally brought food, both Parents generally relied on whatever Foster Parents provided. *See id.* at 244. Lee testified K.M. greeted Mother enthusiastically and is affectionate with

her, but both Parents had difficulty keeping track of him. *See id.* at 248-49. On one occasion, Mother became verbally aggressive with Lee, and threatened another visit supervisor via text. *See id.* at 245, 247.

Catherine Kellner from Adoption Connections supervised visits with K.D.M. *See id.* at 257. She said Parents did visit consistently. *See id.* at 270. She stated that she was concerned about Parents' ability to keep Children safe and supervising, as, when paying attention to one child they would ignore the other, leading to potentially dangerous situations. *See id.* 248. Kellner observed K.D.M. being allowed to climb on chairs and tables, put too much food in his mouth at a time, and being left alone. *See id.* at 256, 260-61.

Bruce Goldhagen, visit supervisor for Justice Works, stated he worked with Parents for approximately six months starting on June 10, 2024. *See id.* at 275. According to Goldhagen, his initial concern with Mother's parenting was her tendency to be overly-emotional about Children, although this had dissipated. *Id.* at 277. She was able to attend to Children's needs and there were no safety issues during either Parent's visits. *Id.* at 278-79, 288, 292. Although Mother was discharged successfully, visits were never able to occur in the family home because of Parents' transient nature. *See id.* at 281. Neither Parent brough diapers. *See id.* at 288. Goldhagen admitted that coached visits were just snapshots in a controlled environment and that visit coaching in the OCYF office is very different than living with a child 24/7. *See id.* at 283, 285.

Dr. Beth Bliss, Ph.D. testified at length as an expert witness and had issued two reports. *See* CYF Exhibit 6. Dr. Bliss performed evaluations of Mother on September 10, 2024, and July 22, 2025, and evaluations of Father on September 10, 2024, and August 5, 2025. Both Parents told her about IPV between them. *See id.* at 40. Mother told Dr. Bliss that, in addition to her relationship with Father, she had a history of relationships involving IPV. *See id.* at 32, 40. Dr. Bliss testified it appeared that Mother had not made any progress in the area of IPV, which can pose a physical risk to the Children if they are present for an incident and, in fact, Father testified K.M. was present and in the way during one of the domestic disputes and actually got hit accidentally. *See id.* at 39-41, 113.

Dr. Bliss testified to the increased risk that Mother, as a person in a physically abusive relationship, will abuse the Children, not to mention the fear, anger, or sadness, and increased risk of mental health problems, behavioral issues, and relationship problems the Children could develop over time. *See id.* at 33. Dr. Bliss concluded Mother did not seem to understand Children's emotional needs and the importance of not being exposed to violent behaviors. *See id.* at 56, 69. Dr. Bliss said that Father admitted the March 31, 2025 and May 26, 2025 IPV incidents, in which he usually is the victim, but that he has hit Mother in self-defense. Dr. Bliss also testified that Father missed court on the most recent incident. *See id.* at 72, 95. Mother was unwilling to talk about the May 26, 2025 IPV incident that resulted in her

arrest, stating she felt she is not permitted by OCYF to make a single mistake. *See id.* at 71. Mother testified she would not talk about the IPV incidents because she was afraid she would not be understood or believed, and that the court would believe anything Dr. Bliss said since she is a licensed provider. *See id.* at 348-50. However, Dr. Bliss believed Mother was minimizing the incident and IPV's effect on Children. *See id.* at 72.

Father admitted drug use to Dr. Bliss, claiming it was not at an abusive or dependent level. However, he also admitted that he was adjudicated when he was fourteen and kept violating probation due to testing positive for marijuana. *See id.* at 41. Father also admitted to his history of delinquent and criminal behavior since that time. *See id.* at 41-42.

Dr. Bliss diagnosed Mother as bipolar, requiring medication and talk therapy, but said Mother was not on medication as of September 2024, although she was attending therapy. *See id.* at 36-38. In Mother's September 2024 evaluation she understood she was having delusional thoughts that impacted her ability to parent the Children, but, in the recent July 2025 evaluation, she did not understand the ongoing concerns. *See id.* at 39. Dr. Bliss testified that, without Mother understanding the continued concerns, she would have significant apprehension about Mother's ability to make meaningful change. *See id.* at 39-40.

Dr. Bliss diagnosed Father with antisocial personality disorder and post-traumatic stress disorder ("PTSD"). *See id.* at 42. Although Father stated he

was no longer going to see Mother for the safety of the Children, Dr. Bliss was not sure whether this could be believed since he had said this before and then returned. *See id.* at 98. Dr. Bliss recommended therapy and IPV treatment for Father. *See id.* at 43. In his August 2025 evaluation, he reported being in both IPV and mental health treatment at Auberle, but Dr. Bliss was unable to verify the treatment. *See id.* at 44, 52. Although Father seemed to understand Children's needs, Dr. Bliss concluded that he is not able to meet their safety and stability needs at the present time. *See id.* at 56.

Dr. Bliss also performed evaluations between Parents and Children. K.M. was excited to see Father and K.D.M. gave him a high-five. *See id.* at 49. Father seemed comfortable and got on the floor to play with them. K.D.M. appeared to be trying to figure out his relationship with Father, but K.M. appeared comfortable with him. *See id.* at 50-51. Dr. Bliss opined that there was at least some bond between Father and Children, but she remained concerned about his parenting and ability to protect them and himself. *See id.* at 100, 102. K.M. shared some bond with Mother, but his attachment was anxious. *See id.* at 44, 49, 75. K.D.M. exhibited a very limited bond with Mother. *See id.* at 48. Although Dr. Bliss found Mother to be positive in her parenting approach, she was unable to engage both Children simultaneously, which could be a safety issue. *See id.* at 46-47, 49, 63.

Dr. Bliss testified both Children appear to have a good relationship with their Foster Parents, with both Children viewing their respective Foster Parents

as their psychological parents, the people they turn to in order to have their needs met. *See id.* at 120-21. She testified that K.D.M.'s Foster Parents encouraged his verbal development, engaged in imaginary play together, laughed and enjoyed time together. K.D.M. has a positive, healthy attachment and bond with them, looking to them anytime he needed help, and is receptive to his foster mother setting limits for him. *See id.* at 53-54. K.M.'s Foster Parents also encouraged verbal development with him. He calls them "Mommy and Daddy." *Id.* at 54. Caseworker Ciera James testified similarly regarding K.M. and K.D.M., observing that they get along well with the other children in their respective foster homes, that K.M. calls his foster parents "Mommy" and "Daddy," and that both Children seek out their Foster Parents to meet their needs and for comfort. *See id.* at 169-70.

Dr. Bliss testified both sets of Foster Parents appeared to be meeting Children's needs and are appropriate adoptive resources. *See id.* at 55. Caseworkers Diana, James, Lee, and Kellner all testified similarly that Children are bonded with their respective Foster Parents, who provide a loving, safe home for Children and meet their needs. *See id.* at 169, 170, 234-35, 251, 265-66. Removal from their Foster Parents could potentially be detrimental as they have been with their Foster Parents safely and securely for 22 months, a large period of their lives.

Dr. Bliss opined that termination of Parents' parental rights would be in Children's best interests. *See id.* at 57. According to her, K.D.M. would not

experience severe emotional detriment if Mother's parental rights are terminated. K.M. does have an anxious bond to Mother, so Dr. Bliss noted he would recognize the loss of their parental rights more than K.D.M. would, but that would be ameliorated by his strong, secure, positive attachment with his Foster Parents. *See id.* at 56-57, 88, 122.

Dr. Bliss had particular concerns about whether Father would stay away from Mother to create a safe environment for Children and the fact that Mother's mental health needed to be stabilized, which would require substantial time. *See id.* at 59-60. He testified that the Children need safety, security, stability, and consistency in housing. *See id.* at 59. Dr. Bliss's ultimate recommendation was the termination of parental rights because Children do not have a necessary and beneficial bond with Parents. *See id.* at 57.[5]

Similarly, despite there being a bond between Children and Parents, Caseworker Diana testified much more time would be needed before OCYF would feel comfortable recommending anything other than supervised contact between Parents and Children. *See id.* at 168, 199. Although Father had made progress, it was only within the last month and a half before the TPR petition had been filed. *See id.* at 196. Due to the fact Children had been in care for

---

[5] Children's counsel filed briefs on their behalf wherein she agrees with the orphans' court that CYF provided clear and convincing evidence to support the termination of Parents' parental rights. *See* Children's Brief, Nos. 1228 & 1229 WDA 2025; Children's Brief, Nos. 1305 &1396 WDA 2025, at 31.

22 months as of the TPR hearing, Parents only recently showing progress, and the significant IPV between Mother and Father putting Children's safety at risk, Diana testified that CYF was seeking termination regardless of any bond Children might have with Parents. CYF believed there will not be extreme emotional detriment if parental rights are terminated but there would be an extreme emotional detriment if Children were removed from the care of their Foster Parents. *See id.* at 171. Each of Children's Foster homes is a pre-adoptive resource and they communicate with each other, get together once or twice a month and permit the Children to Facetime each other. *See id.* at 168.

Based on the foregoing, the orphans' court terminated Parents' parental rights pursuant to 23 Pa. C.S.A. §§ 2511(a)(2), (a)(5), and (a)(8) and (b). Parents timely appealed and filed contemporaneous statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i). The orphans' court filed a Rule 1925(a) opinion on October 24, 2025 addressing the decision as to both Parents. *See* Pa.R.A.P. 1925(a).

On appeal, Parents challenge the orphans' court's conclusion that OCYF presented clear and convincing evidence to support termination of their parental rights.

Our scope and standard of review are well-settled:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will

reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*Interest of R.S.A.D.*, 341 A.3d 787, 794-95 (Pa. Super. 2025) (citation omitted).

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of N.A.S.*, 338 A.3d 191, 196-97 (Pa. Super. 2025) (citation omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights and requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The orphans' court must first consider if termination under one of the eleven enumerated grounds in Section 2511(a) is supported by the parent's conduct. Only if the court determines that the petitioner has established grounds for

termination under Section 2511(a), will the court then assess the petition under Section 2511(b), which focuses on the needs and welfare of the child. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). A court only will involuntarily terminate a parent's rights if the petitioner satisfies both Sections 2511(a) and (b) by clear and convincing evidence. *See Interest of N.A.S.*, 338 A.3d at 197.

In the instant case, the orphans' court terminated Parents' parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b). To affirm the order, however, we need only agree with the court's decision as to any one subsection of Section 2511(a), along with Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As such, we will focus our discussion on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ...
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ...
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

- 22 -

income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish:

1) repeated and continued incapacity, abuse, neglect or refusal;
2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and
3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied.

*In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.P.D.*, 324 A.3d 11, 26 (Pa. Super. 2024) (citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* (citation omitted).

Parents argue the record does not contain clear and convincing evidence for the termination of their parental rights, as it did not reflect "repeated and continued incapacity, abuse, neglect or refusal" that cannot or will not be remedied, or that termination is in Children's best interests. Mother's Brief, at

60-61; Father's Brief, at 12-14, 17-18. Parents complain that the termination of their parental rights fails to appreciate the importance of the biological family bond, the efforts they have made to achieve their reunification goals, and "unnecessarily inflicts another significant trauma" on Children. Mother's Brief, at 79; *see* Father's Brief, at 14-15. However, we observe that Parents appear to be asking this Court to re-weigh the evidence and testimony in their favor, which we cannot do. *See In re Adoption of B.A.S.*, 345 A.3d 787, 793 (Pa. Super. 2025) ("This Court will not re-weigh evidence, and we may not reverse a decision merely because the record could support a different result.") (citation and internal quotation marks omitted).

The orphans' court thoroughly explained the basis for its decision, observing that, although Parents have had periods of compliance with their goals, it was not sustained long-term nor on a consistent basis. A significant observation by the Orphans' Court was the prevalence of violence in the home. As it stated:

> Domestic violence was the most significant issue in this case as [P]arents had been involved in several violent incidents. Domestic violence is always of great concern to the court because of the impact that it has on children in the home. … In this case, Mother was often the aggressor and was arrested several times for physical assaulting Father. Father also admitted that he physically assaulted Mother on at least one occasion. The relationship between the two was particularly toxic and unhealthy. After each incident, neither sought protection from abuse orders and neither followed through with prosecuting the other. Both parents attended some form of IPV counseling throughout the history of the case. Father only attended a few sessions while Mother completed a course of treatment in 2024. Despite attending treatment, the incidents became more violent, with the most

significant incident occurring in May of 2025. So, while they both should be commended for attending some form of treatment, it is apparent that neither made any significant changes in their functioning or decision-making. Both Mother and Father lack insight into the danger that their violent relationship poses to their children.

Orphans' Court Opinion, 10/24/25, at 8 (pagination provided; unnecessary capitalization omitted). Further, the court explained:

Mental health issues have played a significant part in the domestic violence as well as the general instability of the parents. Both parents have significant mental health diagnoses which require regular mental health treatment. Mother has been diagnosed with bipolar disorder. Dr. Bliss opined that bipolar is a manageable condition but that it required medication management and therapy. The OCYF caseworker testified that she was never able to verify that Mother was in mental health treatment. *See* N.T. TPR Hearing, 8/8/25, at 135. Mother reported that in the months prior to the termination hearing, that her medication had been adjusted and that she was doing much better. Mother's therapist testified at the termination hearing where she reported that Mother had been treating with her for over a year. The therapist reported that Mother was engaged and making progress. Interestingly, the therapist did not know the details for either incident in the months prior where Mother was accused of physically attacking Father. She also did not know that Mother tested positive for cocaine in the spring of 2025. It is clear to this court that the therapist's knowledge of Mother's mental health issues is limited. It also further reinforces the notion that Mother does not take accountability for her actions. Mother had a traumatic childhood and has a lot of issues that she needs to address. She has significant diagnoses that she needs to seek long-term treatment for. Some two years later, Mother still has not made any progress in this regard with the exception of perhaps medication management. Father also has significant mental health concerns. Dr. Bliss diagnosed him with antisocial personality disorder and post-traumatic stress disorder. *See id.* at 42. Dr. Bliss reported that Father needed to engage in therapy to address his mental health issues. Father did not meaningfully engage in mental health treatment. He has sporadically attended treatment and never prioritized his mental health. His continued relationship with Mother gives the Court cause to believe that

Father has made no changes in his functioning in the past two years. For these reasons, the court found that [Parents] failed to complete their goal of addressing their mental health.

*Id.* at 8-9 (pagination and record citation formatting provided; unnecessary capitalization omitted). Finally, the court explained:

There were drug and alcohol concerns for both parents as well. Mother never completed a POWER evaluation or attended drug and alcohol treatment. Mother was called in for a total of thirty-four random drug screens and she only appeared for ten of those. Nine of those were positive for THC and Mother reported to having a medical marijuana card. On March 6th, 2025, Mother tested positive for cocaine. Mother downplayed any substance abuse citing that she was young and wanted to party. Father did not attend a POWER evaluation and never attend[ed] drug and alcohol treatment. He was called in for a total of thirty-five screens. He attended five of those screens and all were positive for THC. Father reported that he possessed a medical marijuana card but let it lapse several times. The parents lack of follow through with this court-ordered goal was concerning to the court based upon their history of domestic violence and mental health issues.

\* \* \*

… [Mother] fails to understand how her actions have prevented reunification with [C]hildren. In her most recent evaluation with Dr. Bliss, Mother lacked insight into why [C]hildren continued to be placed in foster care. This was significant to the court because it demonstrated that [] Mother could not make changes because she does not think she needs too. Dr. Bliss echoed this sentiment, reporting "if she genuinely does not understand the continued concerns, there would be significant concern with her ability to make any meaningful change". N.T. TPR Hearing, 8/8/25, at 39-40. Father's mental health has also been problematic as the Court does not believe that he could keep himself or his children safe from Mother. He has not followed through with criminal charges against Mother and lacks insight into how his actions or inactions have prohibited him from reunifying with his children. Neither parent attends medical appointments. …

*Id.* at 9, 11 (pagination and record citation formatting provided; unnecessary capitalization omitted).

Based on our review of the record and the extensive factual history detailed previously, we discern no abuse of discretion in the court's apt explanation. Any "unnecessary significant trauma," Mother's Brief, at 79, already suffered by Children was caused by Parent's IPV. Furthermore, Parents have not fully complied with the goals reasonably necessary to achieve reunification. While Mother points to the fact that she remedied the condition of her home, the record clearly shows that until recently, Mother did not satisfactorily comply with mental health, drug related, or IVP treatment; she has not availed herself of over 2 years' worth of proffered services for reunification, and does not seem to fully appreciate the threat of harm the IVP causes to Children. Similarly, although Father testified he recently secured housing, his testimony was that this was only for a few months and the lease was not renewed. Despite Father's claim that he recently had started attending therapy at Auberle, he only did the intake in April 2025, and conceded he had not attended therapy for the last two months at the time of the TPR hearing. *See* N.T. TPR Hearing, 8/8/25, at 166-67, 357-59.

The Orphans' Court plainly found that Father allowed the Children to remain in the home with Mother despite his knowledge of Mother's mental health issues being a danger to the children as well as the home's deplorable condition. The fact is that when Children were taken from the family home,

he was homeless, living between Mother's home, a friend's place, and his Mother's residence, and seemingly abandoning Children to their plight. Additionally, the IPV between the parties puts Children at risk yet, when asked why he does not just stay away from Mother, Father told Dr. Bliss he just wants to be around her. While Parents had positive interactions with Children during the supervised visits, which seemed to be the only parental responsibility taken by Parents, this hardly supports a finding that the best interests of Children would be served by them being placed in their full time care.

At the time of the TPR hearings, twenty-two months had passed during which the Parents had not fully addressed the effect their marijuana use has had on the Children; their continued and seemingly increasingly violent IPV; and their mental health issues.

Moreover, the Parents have failed to show any interest in Children's extensive medical needs or even daily care. All of this has caused Children "to be without essential parental care, control or subsistence necessary for [their] physical or mental well-being" and Parents are not able to remedy these conditions so that they may assume their full parental responsibilities in a reasonably prompt period of time.

Having found sufficient evidence to support termination pursuant to 23 Pa.C.S.A. § 2511(a)(2), we next consider whether the record supports the orphans' court's finding that termination was appropriate pursuant to 23

Pa.C.S.A. § 2511(b). Parents argue 23 Pa.C.S.A. § 2511(b) was not satisfied because CYF failed to provide clear and convincing evidence that termination would best serve Child's needs and welfare, and the court failed to undertake a sufficient analysis. We disagree.

Section 2511(b) affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has explained:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the child[is] in a pre-adoptive home and whether [she] ha[s] a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*K.T.*, 296 A.3d at 1105-06 (citations and quotations marks omitted).

Specifically, the child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and

- 29 -

thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109. While our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child, the Court has explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id.*

Therefore, the extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *J.M.*, 991 A.2d at 324 (citation omitted). It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839 (citation omitted). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents[.]" *Id.* (citation omitted). We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *See id.*

The orphans' court explained:

Consistent with the Pennsylvania Supreme Court's holding in *In the Interest of K.T.*, … this court considered a variety of factors in its best interest analysis. The court examined the bond between the biological parents and [C]hildren as well as the foster parents and [C]hildren, the safety and stability needs of [C]hildren and [C]hildren's need for permanency.

With respect to a bonding analysis, the court took into account Dr. Bliss's testimony and reports. During the interactional evaluations conducted by Dr. Bliss, [K.D.M.] exhibited a very limited bond to [] Mother. She reported that his attachment appeared somewhere between avoidant and ambivalent towards her. Dr. Bliss reported that [K.D.M.] showed some bond with Father and that his attachment appeared secure at times and more anxious at other

- 30 -

times. During the evaluations with [K.M.], Dr. Bliss noted that [K.M.] exhibited some bond with his Mother but that his attachment with her was anxious. With respect to Father and [K.M.], Dr. Bliss noted that there was some bond but that the attachment was ambivalent. It was Dr. Bliss's ultimate conclusion that neither child has a necessary or beneficial bond with [Parents]. In contrast, Dr. Bliss opined that both [C]hildren shared healthy and strong bonds with their respective foster parents. Both [C]hildren appeared attached to their foster parents and sought them out for praise and comfort. Dr. Bliss opined that both sets of foster parents were meeting the respective needs of [C]hildren. She further opined that any detriment caused by the cessation of the relationship between [C]hildren and [Mother] could be overcome. She explained that the respective foster homes provided [C]hildren with safety, and stability and that [C]hildren had ample support to overcome any detriment caused by losing the relationship with their biological [P]arents.

Safety and stability are also two very important factors that the court considers as part of its best interest analysis. Unfortunately, [P]arents been unable to attain safety and stability for themselves let alone their [C]hildren. Mother was the perpetrator in a particularly violent incident with Father that was almost tortious in nature in 2025. Her mental health has never been stable, and she fails to understand how her actions have prevented reunification with her [C]hildren. In her most recent evaluation with Dr. Bliss, Mother lacked insight into why her [C]hildren continued to be placed in foster care. This was significant to the court because it demonstrated that if Mother could not make changes because she does not think she needs too. Dr. Bliss echoed this sentiment, reporting "if she genuinely does not understand the continued concerns, there would be significant concern with her ability to make any meaningful change[.]" N.T. TPR Hearing, 8/8/25, at 39-40. Father's mental health also has problematic as the court does not believe that he could keep himself or his [C]hildren safe from Mother. He has not followed through with criminal charges against Mother and lacks insight into how his actions or inactions have prohibited him from reunifying with his [C]hildren. Neither [P]arent attends medical appointments. [C]hildren have both found safety and stability in their respective foster homes. They are both thriving and have developed solid relationships with their foster parents and foster siblings. The foster parents are meeting [C]hildren's developmental, physical and emotional needs.

Neither [P]arent is in a position to care for [C]hildren at this time. Neither has made meaningful progress on their court-ordered goals. The conditions which brought [C]hildren into care continue to exist and [P]arents cannot or will not remedy those conditions in a reasonable period of time. [C]hildren view their foster parents as their psychological parents and look to them for safety, stability and comfort. The foster parents are meeting all of their needs at this time and will be able to so for the foreseeable future. It was Dr. Bliss' ultimate conclusion that the termination of both Mother and Father's parental rights would meet [C]hildren's needs and welfare. *See id.* at 58. …

Orphans' Court Opinion, 10/24/25, at 9-11 (pagination and record citation formatting provided; unnecessary capitalization omitted).

The record supports the court's decision. Dr. Bliss and the multiple caseworkers provided ample testimony to support the finding that the bond between Children and their respective Foster Parents is secure and that it is in Children's best interest that they remain with their Foster Families. Contrary to Father's contention otherwise, the history of this case and the twenty-two months Children have been living with their Foster Parents is very relevant. The witnesses stressed the importance of permanency, security, and safety for Children, which Foster Parents provide and Parents have not.

Finally, we note that we are unpersuaded by Father's brief argument that his constitutional rights as a biological parent somehow outweigh Children's best interests. *See* Father's Brief, at 18-19. It is well-settled that "[a] parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent,

healthy, safe environment." *See In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation, brackets and ellipses omitted). Children cannot remain in limbo indefinitely, waiting for Parents' full compliance and performance of their parental duties, putting Children in an unsafe and unstable environment until they do so.

On the other hand, Children have the opportunity to continue living in loving, stable environments with Foster Parents, with whom they have a strong, stable, loving bond. The record fully supports the orphans' court's finding that it is in Children's best interest that Parents' parental rights be involuntarily terminated, and Children's permanency goals changed to adoption.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/17/2026